**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI, SENIOR JUDGE**

_____

|  |  |  |
|---|---|---|
| | ) | |
| **TAO MOTOR INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **KANGDI ELECTRIC VEHICLE (HAINAN)** | ) | |
| **CO., LTD. AND SC AUTOSPORTS, LLC** | ) | |
| **dba KANDI AMERICA, and** | ) | |
| **VEXAS CORPORATION, dba ATLAS,** | ) | **Consol. Court No. 25-00199** |
| | ) | |
| **Consolidated Plaintiffs,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **THE AMERICAN PERSONAL** | ) | |
| **TRANSPORTATION VEHICLE** | ) | |
| **MANUFACTURERS COALITION,** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| | ) | |

_____

**RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF**
**CONSOLIDATED PLAINTIFF VEXAS CORPORATION, DBA ATLAS**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Consolidated

Plaintiff Vexas Corporation, dba Atlas ("Vexas Corporation") hereby respectfully moves for

judgment on the agency record on the issues raised in its Complaint challenging the U.S.

International Trade Commission's ("Commission's") final determination and affirmative critical

circumstances finding. *See Low Speed Personal Transportation Vehicles From China;*

*Determinations*, 90 Fed. Reg. 38,176 (Aug. 7, 2025) and USITC Publication 5652, *Low Speed*

*Personal Transportation Vehicles from China*:  Investigation Nos. 701-TA-731 and 731-TA-

1

1700 (Final).

For the reasons set forth in the attached Memorandum in Support of Consolidated Plaintiff Vexas Corporation's Rule 56.2 Motion for Judgment Upon the Agency Record, the Commission's Commerce's Final Determination is not supported by substantial evidence on the record and is otherwise not in accordance with law.  Vexas Corporation respectfully moves this Court to so hold, to declare the Final Determination unlawful, to remand this case to the Commission for further proceedings consistent with Vexas Corporation's arguments raised in this appeal, and to grant such other relief as many be just and proper.

Vexas Corporation submits the attached Memorandum in Support of this motion.

Respectfully submitted,

/s/ Henry D. Almond
Henry D. Almond
J. David Park
Kang Woo Lee
Archana Rao P. Vasa

*Counsel to Vexas Corporation d/b/a Atlas*

ARNOLD & PORTER KAYE SCHOLER LLP
601 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20001
PHONE:  (202) 942-5646
FAX:  (202) 942-5999
E-MAIL: henry.almond@arnoldporter.com

**Dated:  March 18, 2026**

2

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

———————————————————————

| | |
|---|---|
| TAO MOTOR INC., ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| KANGDI ELECTRIC VEHICLE (HAINAN) ) | **NON-CONFIDENTIAL VERSION** |
| CO., LTD. AND SC AUTOSPORTS, LLC ) | |
| dba KANDI AMERICA, and ) | |
| VEXAS CORPORATION, dba ATLAS, ) | **Consol. Court No. 25-00199** |
| ) | |
| **Consolidated Plaintiffs,** ) | |
| ) | **Confidential information removed** |
| ) | **from pages 13, 14, 19-21, 24** |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| **Defendant,** ) | |
| ) | |
| **and** ) | |
| ) | |
| THE AMERICAN PERSONAL ) | |
| TRANSPORTATION VEHICLE ) | |
| MANUFACTURERS COALITION, ) | |
| ) | |
| **Defendant-Intervenor.** ) | |

———————————————————————

## MEMORANDUM IN SUPPORT OF CONSOLIDATED PLAINTIFF VEXAS CORPORATION'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Henry D. Almond
J. David Park
Kang Woo Lee
Archana Rao P. Vasa

*Counsel to Vexas Corporation d/b/a Atlas Consolidated Plaintiff*

ARNOLD & PORTER KAYE SCHOLER LLP
601 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20001

**March 18, 2026**

**Table of Contents**

I.     Introduction................................................................................................................1

II.    Statement Pursuant to Rule 56.2................................................................................5

    A.     Administrative Determination Under Review ..........................................................5

    B.     Issues Presented and Summary of Argument...........................................................6

III.   Statutory Framework and Statement of Facts..........................................................8

    A.     Statutory Framework ...............................................................................................8

    B.     Statement of Facts.................................................................................................10

IV.    Standard of Review...................................................................................................15

    A.     The Commission Must Support its Determinations with Substantial
        Record Evidence ....................................................................................................15

    B.     The Commission's Determinations Must Be in Accordance with Law.................17

V.     Argument ...................................................................................................................18

    A.     The Majority's Analysis With Respect to the Antidumping Investigation Is
        Not Appropriately Limited to Imports that were "Subject To" Commerce's
        Affirmative Critical Circumstances Determination ..............................................18

        1.     With Xiamen Dalle's Imports Excluded, Import Volumes and
            Inventory Levels are Insufficient to Support an Affirmative Critical
            Circumstances Determination...................................................................18

        2.     The Commission Did Not Tie Its Discussion of Underselling and
            Market Share to the Statutory Inquiry ......................................................23

    B.     The Majority's Analysis Did Not Address The Remedial Effect of the
        Orders.....................................................................................................................25

VI.    Conclusion .................................................................................................................29

**TABLE OF AUTHORITIES**

**Cases**                                                                                                   **Page(s)**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F.Supp.2d 1327 (Ct. Int'l Trade 2011) ................................................................................................................16

*Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365 (Fed. Cir. 2002) ..................................17

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ..........................................15

*Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197 (1938) ................................................15

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) .......................................15

*JMC Steel Group v. United States*, 24 F. Supp. 3d 1290 (Ct. Int'l Trade 2014) ...........................16

*LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455 (Fed. Cir. 1990) ...................16

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ...............................................................17

*Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608 (Ct. Int'l Trade 1993) ................................................................................................................16

*Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017) ................................17

*Mosaic Co. v. United States*, 160 F.4th 1340 (Fed. Cir. 2025) ......................................................17

*Motor Vehicle Mfrs. Assn v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...........17, 22, 28

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ...........................................15

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ...........................................15

*NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ..............................22

*Star Fruits S.NC. v. U.S.*, 393 F.3d 1277 (Fed. Cir. 2005) ............................................................17

*Timken U.S. Corp. v. United States*, 421 F.3d 1350 (Fed. Cir. 2025) ............................................28

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ..........................................................15, 16

*U.S. Steel Grp. v. United States*, 96 F.3d 1352 (Fed. Cir. 1996) ...................................................17

*Wind Tower Trade Coal. v. United States*, 569 F. Supp. 3d 1221 (Ct. Int'l Trade 2022) ................................................................................................................16

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed.
    Cir. 2013) ..........................................................................................................16, 22

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................................15

19 U.S.C. § 1516a(b)(2)(A) ......................................................................................16

19 U.S.C. § 1671d(b)(4) ..................................................................................... *passim*

19 U.S.C. § 1673d(b)(4) ..................................................................................... *passim*

19 U.SC. § 1673b(e) ...................................................................................................8

19 U.S.C § 1671b(e) ...................................................................................................8

19 U.S.C. § 1677f(i)(3)(b) ........................................................................................17

**Commission Determinations**

*Honey from Argentina and China*, Investigation Nos. 701-TA-402 and 731-TA-
    892-893, USITC Pub. 3470 (Nov. 2021) (Final) ..........................................1

*Certain Preserved Mushrooms from China, India, and Indonesia*, Inv. Nos. 731-
    TA-777-779, USITC Pub. 3159 (Feb. 1999) (Final) ..................................2

*Low Speed Personal Transportation Vehicles From China; Institution of
    Antidumping and Countervailing Duty Investigations and Scheduling of
    Preliminary Phase Investigations*, 89 Fed. Reg. 53,440 (June 26, 2024)................10

*Low Speed Personal Transportation Vehicles From China Determinations*, 89
    Fed. Reg. 65,398 (Aug. 9, 2024)........................................................................8

*Low Speed Personal Transportation Vehicles (LSPTVs) from China; Scheduling
    of the Final Phase of Countervailing Duty and Antidumping Duty
    Investigations*, 90 Fed. Reg. 9,345 (Feb. 11, 2025)................................................11

*Low Speed Personal Transportation Vehicles From China; Determinations*, 90
    Fed. Reg. 38,176 (Aug. 7, 2025).......................................................................5, 12

*Low Speed Personal Transportation Vehicles from China*: Investigation Nos. 701-
    TA-731 and 731-TA-1700 (Final) ...................................................... *passim*

**Commerce Determinations**

*Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Aug. 12, 2025) ...................................................................................................................13

*Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Determination of Critical Circumstances, in Part, and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 96,942 (Dec. 6, 2024)............................................................10, 26

*Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Preliminary Affirmative Determination of Sale at Less Than-Fair Value Investigation, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination and Extension of Provisional Measures*, 90 Fed. Reg. 8,517 (Jan. 30, 2025).........................................11, 12, 26

*Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, in Part, 90 Fed. Reg. 26,530 (June 23, 2025) ......................................................................................12, 26

*Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 26,536 (June 23, 2025)...............................................................................................12, 26

*Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Aug. 12, 2025) ...................................................................................................................27

## I.      Introduction

Vexas Corporation d/b/a/ Atlas ("Vexas Corporation"), an importer of merchandise subject to the investigations and a consolidated plaintiff in this consolidated in this action, submits this Rule 56.2 motion for judgment on the agency record and supporting brief to challenge the International Trade Commission's ("Commission's") affirmative critical circumstances determination in the Commission's investigation of Low Speed Personal Transportation Vehicles from China.  Vexas Corporation also supports the briefs being submitted today by Plaintiff Tao Motor, Inc. and consolidated plaintiffs Kangdi Electric Vehicle (Hainan) Co., Ltd. and SC AutoSports, LLC D/B/A Kandi America.

Until a few years ago, affirmative critical circumstances determinations by the Commission were exceedingly rare.  To the best of counsel's knowledge, prior to 2021, the Commission last issued an affirmative critical circumstances determination in 2001, in a case involving Honey from China.  *See*, *Honey from Argentina and China,* Investigation Nos. 701-TA-402 and 731-TA-892-893, USITC Pub. 3470 (Nov. 2021) (Final).  That is, the Commission went 20 years without reaching an affirmative critical circumstances finding.  After this 20 year gap, the Commission has now reached a handful of affirmative critical circumstances determinations in the last few years, including one in 2021 (Small Vertical Shaft Engines from China), one in 2022 (Raw Honey from Vietnam), two in 2024 (Pea Protein from China and Mattresses from Burma), and three in 2025 (Paper Plates from China, Thermoformed Molded Fiber Products from Vietnam, and the instant case, Low Speed Personal Transportation Vehicles from China).

Respondent parties cited some of the Commission's many prior negative critical circumstances determinations, pointing to instances where the Commission reached negative

1

determinations when faced with larger increases in imports than present in this case.  *See e.g.* Tao

Motor's Prehearing Comments (June 5, 2025), at 4, P.R. 145.[1]  Yet, the Commission flatly stated

that this history and its analysis in prior cases were irrelevant.  *See* Commission Views at 72, n.

313, C.R. 320 (rejecting respondents' arguments related to import increases in other cases and

noting the "*sui generis* nature" of its antidumping and countervailing duty proceedings).  While

we do not suggest these prior rulings and 20-year gap in affirmative critical circumstances

determinations is controlling, this Court should view the Commission's analysis in this case

through this consistent historical lens – one where the Commission has recognized that the

statute places an exceedingly high threshold to reaching an affirmative critical circumstances

determination.

In order to reach an affirmative critical circumstances finding, the Commission must find

that imports from a period prior to the suspension of liquidation are likely to "seriously

undermine" the remedial effects of the antidumping or countervailing duty order.  19 U.S.C. §

1671d(b)(4) and 1673d(b)(4).  The Commission's history of going 20 years without an

affirmative finding itself suggests that this "seriously undermine" standard is an exceedingly

high one, and the Commission itself has said as much, stating:

> {T}he plain meaning of the term "undermines seriously" establishes a very high
> standard: that the surge in imports greatly and insidiously weakens or subverts the
> effects of the order.

*See Certain Preserved Mushrooms from China, India, and Indonesia*, Inv. Nos. 731-TA-777-779,

USITC Pub. 3159 (Feb. 1999) (Final) at 28.  Applying a high standard here is appropriate, as an

affirmative critical circumstances decision results in the extraordinary remedy of applying

---

[1] Throughout this brief we refer to record documents by their document number as indicated in the November 24, 2025, record index submitted by the Commission.  "P.R." references refer to the public document number, and "C.R." references refer to the confidential document number.

significant retroactive duty charges to imports that were not subject to duties at the time of entry into the United Staes and that cannot be avoided by halting imports or re-exporting the impacted merchandise.  In short, Vexas Corporation submits that this high standard was not met in this case.

Here, the Commission reached a split 2-1 decision, with Commissioner Johanson dissenting from the majority's finding that the record supported a critical circumstances determination.  In reaching its affirmative decision, the majority of the Commission does not define or describe how it analyzed whether the imports at issue were likely to "seriously undermine" the remedial effect of the antidumping and countervailing duty orders, nor did they explain how antidumping and countervailing duty orders that imposed significant duty rates could be "seriously undermined."  Rather, the majority cites a handful of record facts and states a conclusion, without explaining how the facts led the Commission to reach its conclusion.  These considerations are especially stark in the case of the antidumping duty investigation.  There, the largest Chinese producer/exporter was not included in Commerce's antidumping critical circumstances decision, thus its imports were excluded from the analysis, leaving only a fraction of total imports to support the Commission's decision.

The Commission's decision is flawed in multiple respects, and Vexas Corporation raises three principal challenges with respect to the Commission's analysis and determinations.  The first two challenges relate specifically to the Commission's determination with respect to critical circumstances in the antidumping duty investigation.  In particular, because the U.S. Department of Commerce ("Commerce") reached a negative critical circumstances determination in its antidumping duty investigation with respect to Chinese producer Xiamen Dalle, the Commission was required to not consider the company's imports in its analysis.  The first legal and factual

3

error we claim is that although the Commission nominally removed the company's imports from the antidumping duty import data and inventory data it cited in its determination, it did not meaningfully address the fact that with those data removed the import quantities and inventory levels were so small as to not support the agency's critical circumstances decision. Second, the Commission cited, and heavily relied upon, underselling and market share data related to all imports from China, inclusive of Xiamen Dalle's imports. The Commission did not explain how these factors were relevant to the question at hand – whether post-petition imports could "seriously undermine" the remedial effect of the order. Moreover, focusing on market share data considerations that account for all Chinese imports is contrary to the statute, the Commission acted contrary to the express terms of the operative statute, which instruct the Commission to analyze critical circumstances with respect to imports "subject to" Commerce's critical circumstances determination. Because Xiamen Dalle's imports were not subject to Commerce's antidumping duty critical circumstances decision, the Commission cannot rely on analysis considering market share factors that account for all Chinese imports.

Third, with respect to both the antidumping and countervailing duty determinations, the Commission failed to reasonably explain how the identified imports would undermine the remedial effect of the antidumping and countervailing duty orders when reaching its decision as to whether imports subject to Commerce's determination were likely to seriously undermine those remedial effects. The actual expected remedial effects of the orders are a key factor to consider when measuring whether imports prior to the imposition of duties are likely to undermine the remedial effects of the order – the Commission cannot reasonably reach any determination as to the likelihood of the effects of the orders being undermined without addressing the remedial effects themselves. In his dissenting views, Commissioner Johanson

4

rightly addressed the high duties Commerce imposed in these investigations. These high duties in essence are the remedial measure imposed, and their impact on the market and domestic producers are the "remedial effects" the statute references. The Commission's majority opinion should likewise have addressed the high duty rates and consequent expected remedial effects of the orders. Neglecting to address the remedial effects of the orders renders the Commission's decisions unsupported and contrary to law.

Accordingly, and for the reasons further explained below, this Court should remand the Commission's affirmative critical circumstances determinations in these investigations for further consideration in line with the arguments presented in this brief.

## II.    Statement Pursuant to Rule 56.2

### A. Administrative Determination Under Review

This action seeks judicial review of the Commission's final affirmative critical circumstances determination in the antidumping and countervailing duty investigations of Low Speed Personal Transportation Vehicles from China. *See Low Speed Personal Transportation Vehicles From China; Determinations*, 90 Fed. Reg. 38,176 (Aug. 7, 2025). P.R.215. The Commission's full public analysis and views are contained in USITC Publication 5652, entitled *Low Speed Personal Transportation Vehicles from China: Investigation Nos. 701-TA-731 and 731-TA-1700 (Final)*. P.R. 216.

The confidential version of the Commission's data analysis and Commissioner views are included in separate confidential documents. The Commission's data analysis is included in the Commission's July 5, 2025, Staff Report, C.R. 293 (as amended by the Revisions to the Staff Report, C.R. 310). The August 6, 2025, Views of the Commission are included at C.R. 320 ("Commission Views" or "Majority Views") and the August 6, 2025, Dissenting Views of Commissioner Johanson are included at C.R. 321 ("Dissenting Views").

**B. Issues Presented and Summary of Argument**

1.  Whether the Commission appropriately considered the volume of imports and inventory increases in its antidumping critical circumstances analysis when excluding Chinese producer Xiamen Dalle.

Pursuant to 19 U.S.C. § 1673d(b)(4), the Commission is required to determine "whether the imports subject to" Commerce's affirmative critical circumstances determination "are likely to undermine seriously the remedial effect of the antidumping duty order to be issued." 19 U.S.C. § 1673d(b)(4). This instruction to limit the analysis to "imports subject to" Commerce's affirmative critical circumstances determination requires the Commission to exclude from its analysis imports that were found by Commerce to not be subject to an affirmative finding. This scenario applies to Chinese producer/exporter Xiamen Dalle; in its final determination, Commerce found that critical circumstances did not exist with respect to imports from Xiamen Dalle. As such, the Commission was required to remove its imports from the import and inventory data the Commission analyzed under the statue.

The Commission did remove Xiamen Dalle's imports from the import and inventory data it cited; however, the Commission did not meaningfully address the fact that with Xiamen Dalle's imports removed, the import and inventory data revealed only minimal imports, which could not support an affirmative critical circumstances finding. Rather than reach a reasoned conclusion tying the record facts to the conclusion drawn, the Commission simply recited the factual import data in a few short sentences, and closed its critical circumstances analysis with a conclusory statement finding that the critical circumstances statute had been satisfied. The substantial evidence standard requires more, and any fulsome review and consideration of the data under the statutory standard could only support a negative critical circumstances finding.

6

2. Whether the Commission appropriately included underselling sales and market share data in its analysis without linking the data and analysis to the statutory question of whether post-petition imports seriously undermined the remedial effect of the orders.

Among the data and factors the Commission considered in its antidumping duty critical circumstances analysis, the Commission looked to its underselling analysis and domestic producer lost market share data to support its critical circumstances finding. However, the Commission did not articulate how these data related to the statutory analysis, nor did the Commission account for the small volume of imports subject to the Commission's import surge and inventory increase analysis. Absent some link to the statutory question the Commission's reliance on these datapoints was unreasonable and these data cannot be said to constitute substantial evidence supporting the agency's determination. Moreover, relying on market share data pertaining to *all* Chinese import sources is contrary to 19 U.S.C. § 1673d(b)(4), which requires the Commission to consider only imports subject to Commerce's critical circumstances determination.

3. Whether the Commission adequately addressed the "remedial effects" of the antidumping and countervailing duty orders in reaching its determination that the remedial effects were likely to be seriously undermined by post-petition imports.

The antidumping and countervailing duty orders Commerce issued in its investigations imposed remarkably high duty rates – the combined duty rate applicable to Vexas Corporation's imports as set forth in the orders is 333.14 percent. *See Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Aug. 12, 2025). Commerce assigned similarly high rates in its Preliminary and Final Determinations. 19 U.S.C. §§ 1671d(b)(4) and 1673d(b)(4)(A) require the Commission to determine whether the remedial

effect of the antidumping and countervailing duty orders is likely to be seriously undermined. Reaching this determination necessarily requires some analysis and assessment of the actual remedial effect the orders. Absent any consideration of the expected remedial effects of the orders, the Commission's analysis is contrary to the statute and incomplete, and thus unsupported by substantial record evidence.

### III.     Statutory Framework and Statement of Facts

#### A. Statutory Framework

In instances where the U.S. Department of Commerce reaches a preliminary affirmative antidumping or countervailing duty determination and determines that critical circumstances exist, it then suspends liquidation of those entries on a retroactive basis back to 90 days prior to the date of publication of the preliminary determinations. *See* 19 U.SC. § 1673b(e) (antidumping duty) and 19 U.S.C § 1671b(e) (countervailing duty) (these provisions allow for the retroactive suspension to the later of 90 days prior to the suspension of liquidation (i.e., the date of publication of the preliminary determination) or the date of initiation of the investigation; in almost all cases, including the one at hand, the publication of the preliminary determination is the later of those two dates).

If Commerce then issues affirmative critical circumstances determinations as part of its final determinations, then the Commission is to proceed to reach its own critical circumstances determination. *See* 19 U.S.C. § 1671d(b)(4)(A) (countervailing duty) and 19 U.S.C. § 1673d(b)(4)(A) (antidumping duty). In particular, under 19 U.S.C. § 1673d, related to

antidumping duty investigations, the section of the statute related to the Commission's final

determination, 19 U.S.C. § 1673d(b)(4), instructs as follows:[2]

(4) Certain additional findings

(A) Commission standard for retroactive application.—

(i) In general.—

If the finding of the administering authority under subsection (a)(3) is affirmative, then the final determination of the Commission shall include a finding as to whether the imports subject to the affirmative determination under subsection (a)(3) are likely to undermine seriously the remedial effect of the antidumping duty order to be issued under section 1673e of this title.

(ii) Factors to consider.—In making the evaluation under clause (i), the Commission shall consider, among other factors it considers relevant—

(I) the timing and the volume of the imports,

(II) a rapid increase in inventories of the imports, and

(III) any other circumstances indicating that the remedial effect of the antidumping order will be seriously undermined.

As set forth above, the Commission is charged with answering the question of whether "the

imports subject to" Commerce's affirmative critical circumstances determinations "are likely to

undermine seriously the remedial effect of the antidumping" or countervailing duty orders.  In

reaching that decision, the Commission is to look to the timing and volume of imports, increases

in inventories, and any other circumstance that would indicate the remedial effect of the order

will be seriously undermined.

---

[2] This citation is to the antidumping duty statute.  The countervailing duty statute, 19 U.S.C. § 1671d(b)(4), is identical, with the exception of the references to "antidumping" versus "countervailing" and a reference to "subsection (a)(3)."  The countervailing duty statue references "subsection (a)(2)," the parallel subsection in the countervailing duty statute.  For simplicity and brevity, throughout the remainder of this brief we will only reference the antidumping duty statute unless there is a specific need to reference the countervailing duty statute.

### B. Statement of Facts

On June 20, 2024, the American Personal Transportation Vehicle Manufacturers Coalition, consisting of Club Car LLC and Textron Specialized Vehicles, Inc. filed a petition with the Commission and Commerce, alleging that the U.S. industry was materially injured or threatened with material injury by reason of subsidized and dumped imports of LSPTVs from China. *See generally* Petition, P.R.1, C.R.1. The Commission then published its notice of institution of investigations shortly thereafter. *See Low Speed Personal Transportation Vehicles From China; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 89 Fed. Reg. 53,440 (June 26, 2024), P.R.15.

On August 9, 2024, the Commission issued its preliminary affirmative injury determination. *See Low Speed Personal Transportation Vehicles From China Determinations*, 89 Fed. Reg. 65,398 (Aug. 9, 2024), P.R. 81.

On December 6, 2024, Commerce published its preliminary affirmative countervailing duty determination, finding affirmative critical circumstances, in part. *See Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Determination of Critical Circumstances, in Part, and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 96,942 (Dec. 6, 2024) ("*Commerce Preliminary CVD Determination*"). Commerce's preliminary countervailing duty rates ranged from 22.84 percent to 515.37 percent. *Id.* With Commerce having suspended liquidation 90 days retroactively, this means that imports on or after September 7, 2024, were subject to Commerce's preliminary countervailing duty critical circumstances determination and retroactive suspension of liquidation.

10

On January 30, 2025, Commerce published its preliminary affirmative antidumping duty determination, finding affirmative critical circumstances. *See Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Preliminary Affirmative Determination of Sale at Less Than-Fair Value Investigation, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination and Extension of Provisional Measures*, 90 Fed. Reg. 8,517 (Jan. 30, 2025) ("*Commerce Preliminary AD Determination*"). Commerce's final antidumping duty rates ranged from 119.39 percent to 478.09 percent. *Id*. With Commerce having suspended liquidation 90 days retroactively, this means that imports on or after November 1, 2024, were subject to Commerce's preliminary antidumping duty critical circumstances determination and retroactive suspension of liquidation.

With Commerce issuing affirmative antidumping and countervailing duty determinations, the Commission proceeded with its final phase investigation. *See Low Speed Personal Transportation Vehicles (LSPTVs) from China; Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 90 Fed. Reg. 9,345 (Feb. 11, 2025), P.R. 105. As part of this process, the Commission issued questionnaires to interested parties, including Vexas Corp., and solicited briefs in advance of its hearing. On June 5, 2025, interested parties, including Vexas Corp. submitted prehearing briefs. In its prehearing brief, Vexas Corp. submitted brief arguments as to why the Commission should reach a negative critical circumstances decision and also indicated its support for and incorporated by reference arguments included in briefs filed by other parties. *See* Prehearing Brief of Vexas Corp. dba Atlas (June 6, 2025), P.R. 146, C.R. 274.

On June 12, 2025, the Commission held its hearing. *See* Commission Hearing Transcript, P.R. 191.

11

On June 23, 2025 Commerce published its final affirmative antidumping, countervailing duty and critical circumstances determinations. *See Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 26,530 (June 23, 2025) ("*Commerce Final AD Determination*") and *Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 26,536 (June 23, 2025) ("*Commerce Final CVD Determination*").

With respect to the antidumping critical circumstances determination, Commerce found that no critical circumstances existed with respect to imports from Chinese producer Xiamen Dalle. *See Commerce Final AD Determination*, 90 Fed. Reg. at 26,531. In the Countervailing duty investigation, Commerce found that critical circumstances existed for all producer/exporters. *See Commerce Final CVD Determination*, 90 Fed. Reg. at 26,537. As discussed below, these different factual findings by Commerce are important to the Commission's analysis, because it meant the Commission was to look at two different sets of data, one with respect to the antidumping duty investigation and one with respect to the countervailing duty investigation when reaching its critical circumstances decisions in the two investigations.

On July 17, 2025, the Commission held its vote and the Commission's published its determination on August 7, 2025. *See Low Speed Personal Transportation Vehicles From China; Determinations*, 90 Fed. Reg. 38,176 (Aug. 7, 2025), P.R.215. The Commission's full analysis and views are contained in USITC Publication 5652, entitled Low Speed Personal Transportation Vehicles from China: Investigation Nos. 701-TA-731 and 731-TA-1700 (Final) ("ITC Final

NON-CONFIDENTIAL VERSION

Publication"), P.R. 216.  The Commission's injury determination was on the basis of a unanimous 3-0 vote, and the Commission's affirmative critical circumstances decision was on the basis of a 2-1 vote.

In reaching its determinations, the Commission had to assess the antidumping and countervailing duty case records separately.  In particular, because Commerce found that critical circumstances did not exist for Xiamen Dalle, data related to its imports needed to be excluded from the data the Commission reviewed for critical circumstances with respect to the antidumping duty order.  *See e.g.*, ITC Final Publication at pp. 4.9 - 4.13 (containing separate data tables for the antidumping and countervailing duty investigations).

As noted above, the Commission's critical circumstances vote was a split vote.  Chair Amy Karpel and Commissioner Jason Kearns voted in the affirmative, and Commissioner Johanson voted in the negative.  The majority views are included in the "Views of the Commission" section of the Commission's final publication, at pages 50-60, and Commissioner Johanson's views are included in a separate opinion at pages 61 to 68 of the ITC Final Publication.  P.R. 211, C.R. 320 (Majority Views), C.R. 321 (Dissenting Views).

In reaching its antidumping affirmative critical circumstances decision, the majority looked to imports from all sources other than Chinese producer/exporter Xiamen Dalle.  Majority Views at 72.  The Majority looked to the increase in imports in the five months prior to the petition as compared to the five months after the petition, citing an increase in imports from [        ] units in the five months prior to the petition to [        ] units in the five months after the petition.  *Id.*  The majority also compared those imports during those periods to the overall U.S. apparent 2024 consumption level, finding that imports during the post-petition period accounted for [      ] percent of 2024 consumption after the petition, compared with [    ] percent

13

NON-CONFIDENTIAL VERSION

before the petition. *Id.* With regard to inventories, the Commission found that inventories increased from [          ] units before the petition to [          ] units five months after the filing of the petition. *Id.* at 73. The majority also pointed to underselling and the condition of the U.S. industry to support its affirmative critical circumstances decision. *Id*. at 73-75.

The majority conducted a similar analysis with respect to the countervailing duty investigation, finding that imports, this time including shipments from Xiamen Dalle, increased from [          ] units in the five months prior to the petition to [          ] units in the five months after the petition. *Id*. at 76. The Commission also found an increase in inventories, pointed to underselling, and the condition of the U.S. industry to support an affirmative critical circumstances decision with respect to the countervailing duty investigation. *Id.* at 77-79.

In his Dissenting Views, Commissioner Johanson reviewed the same data, but reached a negative critical circumstances decision. *See* Dissenting Views P.R. 211, C.R.321. With respect to the countervailing duty investigation analysis, Commissioner Johanson found that subject imports subject to the critical circumstances determination would "exacerbate the injury to some degree," but that any detrimental effect of the imports to the U.S. industry would not undermine seriously the remedial effect of the order. *Id.* at 5. In reaching this decision, he pointed to record information showing that the domestic industry's condition in "was not particularly acute in 2024" and the high antidumping and countervailing duty rates Commerce assigned in the investigations, as well as other tariffs in place. *Id.* at 5-7. He also viewed the high duty rates as having a likely effect of reducing the incentive for importers to sell at unfairly traded prices. *Id.* at 8. In addition, Commissioner Johanson pointed to the different segments of the market that domestic supply and imports service that would allow the domestic industry to "take advantage of the remedial effect of the orders." *Id.* at 8.

With respect to the antidumping duty investigation, Commissioner Johanson noted that much of his analysis with respect to the countervailing duty investigation held for the antidumping investigation, but noted that with Xiamen Dalle excluded from the import and inventory data, the lower levels of imports and inventory further supported a negative critical circumstances determination.

## IV.    Standard of Review

This Court will hold the Commission's determinations unlawful where they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  These standards are detailed below in turn.

### A.  The Commission Must Support its Determinations with Substantial Record Evidence

The Commission's factual findings and conclusions cannot be upheld if they are "unsupported by substantial evidence on the record."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)); *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  "{S}ubstantial evidence is more than a mere scintilla." *Universal Camera*, 340 U.S. at 477 (quoting *Consol. Edison Co.*, 305 U.S. at 229).

To satisfy the "substantial evidence" standard, the Commission must take into account "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003).  The Court may not sustain the Commission's determination as supported by substantial evidence if it does not take "into

15

account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera*, 340 U.S. at 487-488 (the reviewing authority must consider "the record in its entirety . . . , including the body of evidence opposed to the {agency's} view").

The Commission's factual findings "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608, 624 (Ct. Int'l Trade 1993); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F.Supp.2d 1327, 1334 (Ct. Int'l Trade 2011) (because the agency "failed to take into account record evidence that fairly detracts from the weight of the evidence supporting its . . . determinations, these determinations are not supported by substantial evidence."). While the agency is not required to "address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermine{} its reasoning and conclusion." *Wind Tower Trade Coal. v. United States*, 569 F. Supp. 3d 1221, 1248 (Ct. Int'l Trade 2022) (citations omitted); *see also JMC Steel Group v. United States*, 24 F. Supp. 3d 1290, 1304 (Ct. Int'l Trade 2014). "Record evidence" under the Court's standard of review includes all information "presented to or obtained by" the Commission during its investigation. 19 U.S.C. § 1516a(b)(2)(A). Accordingly, the Commission may not dismiss significant record evidence without meaningful substantive engagement.

Finally, the Commission cannot rest on speculation or assumptions unsupported by the record. *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). Particularly where relevant record evidence exists, the Commission's "speculation. . . must yield to evidence." *LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990).

**B. The Commission's Determinations Must Be in Accordance with Law**

To be "in accordance with law," the Commission's determination must comply with the antidumping and countervailing duty statutes. The Court "review{s} the Commission's conclusions of law *de novo*." *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1369 (Fed. Cir. 2002) (citing *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1356 (Fed. Cir. 1996)). Likewise, the courts are to review questions of statutory interpretation *de novo*. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024); *Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025).

Additionally, to be "in accordance with law," the Commission cannot act arbitrarily and must exercise discretion reasonably. *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017) ("Commerce's decision will be set aside if it is arbitrary and capricious."); *see also Star Fruits S.NC. v. U.S.*, 393 F.3d 1277, 1281 (Fed. Cir. 2005) ("An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighting relevant factors.").

The Commission acts arbitrarily if it does not articulate a reasonable explanation for its decision. Indeed, the statute requires the Commission "to include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties . . . concerning volume, price effects, and impact on the industry of imports of the subject merchandise." 19 U.S.C. § 1677f(i)(3)(b). The Commission does not provide an adequate explanation and therefore acts arbitrarily where it does not consider "an important aspect of the problem" or "offer{s} an explanation for its decision that runs counter to the evidence." *Motor Vehicle Mfrs. Assn v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

17

(1983).  Overall, the Court must ensure the Commission has provided sound reasoning to support its determination.

## V.    Argument

### A.  The Majority's Analysis With Respect to the Antidumping Investigation Is Not Appropriately Limited to Imports that were "Subject To" Commerce's Affirmative Critical Circumstances Determination

Pursuant to 19 U.S.C. § 1673d(b)(4), if Commerce reaches an affirmative critical circumstances determination, then "the Commission shall include a finding as to whether the imports subject to the affirmative determination under subsection (a)(3) are likely to undermine seriously the remedial effect of the antidumping duty order."  19 U.S.C. § 1673d(b)(4).  In making this determination, the Commission considers certain factors, including the (1) the timing and volume of the imports; (2) a rapid increase in inventories of the imports; and (3) "other circumstances" showing that the remedial effects of the order will be "seriously undermined."  *Id*.  The Commission's analysis of all three of these factors with respect to the antidumping duty investigation is flawed in two key respects addressed in this section of this brief.  First, the Commission did not appropriately recognize that the shipment and inventory volumes in its analysis reflect relatively small volumes of imports once Xiamen Dalle is removed.  Second, its analysis of underselling and market share appear to reflect all subject imports, inclusive of Xiamen Dalle's imports, and not just imports subject to Commerce's affirmative critical circumstances determination.

### 1.  With Xiamen Dalle's Imports Excluded, Import Volumes and Inventory Levels are Insufficient to Support an Affirmative Critical Circumstances Determination

As noted above, in conducting its separate antidumping and countervailing duty critical circumstances analyses, the Commission excluded imports from Xiamen Dalle from its analysis in the antidumping duty investigation because Commerce reached a negative critical

18

circumstances decision with respect to the company.  *See e.g.*, ITC Final Publication at pp. 4.9 - 4.13.  This exclusion is not trivial.  In particular, Xiamen Dalle was **[                    ]** exporter from China, accounting for over **[    ]** percent of exports reported by foreign producers who responded to the Commission's questionnaire.  ITC Final Publication at Table 7.2, p. 7.4.  With these exports excluded from the analysis, the remaining imports and inventory are insignificant and do not support an affirmative critical circumstances finding.  In particular, the Commission points to imports increasing from **[        ]** units in the pre-petition period to **[        ]** units in the post-petition period (an increase of **[        ]** units).  *See* Commission Views at 72; Staff Report at Table 4.7.  The Commission describes this increase as an increase of **[        ]** percent, and indicates that the post-petition period imports are equivalent to **[        ]** percent of total U.S. shipments and **[    ]** percent of apparent U.S. consumption in 2024.  *Id.*

While the Commission accurately recites these facts, the Commission offers no explanation as to how five months of imports that amount to just over **[        ]** percent of total annual U.S. consumption can be viewed as having an effect that would seriously undermine the remedial effect of the antidumping duty order.  The lack of significant imports is further evidenced by the fact that the increase in imports subject to Commerce's final critical circumstances determination was only **[        ]** units.  Relative to 2024, U.S. consumption of **[        ]** units, as indicated in Table C.1 of the ITC Final Publication, this increase across five months accounts for only **[    ]** percent of U.S. annual consumption.  This comparison of five months of post-petition import data relative to annual consumption is necessarily imperfect, as the Commission recognized, but no matter how one views these data, the small volume of imports, even if increasing, cannot be said to "seriously undermine" the remedial effects of the antidumping duty order.  While the Commission characterized the increase as significant in

19

NON-CONFIDENTIAL VERSION

percentage terms, it did not reconcile that characterization with the underlying scale of the market.  The Commission's failure to address this disparity renders its conclusion unsupported by substantial evidence.  Given that the entire critical circumstances exercise is to evaluate the impact of an increase in imports, assessing the size of the increase relative to the overall market is a critical piece of the Commission's analysis if it is to be supported by substantial record evidence.

The statute does not ask merely whether imports increased, but whether the imports at issue are of such magnitude that they would "seriously undermine" the remedial effect of the order.  That standard requires the Commission to assess whether the volume of imports is sufficient in terms of scale and overall market impact, to materially weaken the effectiveness of the orders.  To undermine the effectiveness of the order, the pre-suspension imports must have some staying power and overhang effect, such that their presence in the market after suspension of liquidation and after the imposition of the orders would seriously undermine the effectiveness of the orders.

At bottom, the Commission simply did not explain how an increase of imports representing only **[    ]** percent of annual consumption could plausibly have such a material effect in terms of, for example, price pressure or displacement of domestic sales.  If the volumes identified here are sufficient to satisfy the "seriously undermine" standard, the statutory limitation would have no meaning, as even modest or short-lived increases in imports could justify retroactive duties.  While the Commission accurately recites the facts and data, it offers no explanation as to how such small import volumes support its decision.  As a result, even accepting the Commission's figures, a remand is required for the Commission to explain why these figures amount to a serious undermining of the remedial effect of the orders.

NON-CONFIDENTIAL VERSION

The same considerations are even more stark with respect to the inventory data. Specifically, the record shows that inventory of subject units increased from **[          ]** units before the petition to **[          ]** units at the end of November, just before Commerce issued its first preliminary determination, an increase of **[          ]** units. *See* Commission Views at 73. The Commission again accurately recites the fact that this constitutes a **[    ]** percent increase. *Id*. However, as with the import volume data, the Commission does not grapple with the fact that these inventory levels are insignificant when measured against U.S. consumption in 2024 of **[          ]** units. The total subject inventory of **[          ]** is equivalent to **[    ]** percent of 2024 consumption; when measured in days, this is enough stock to supply the U.S. market for approximately **[    ]** days. But again, the more relevant inquiry is what impact could the *increase* in inventory have. *See* 19 U.S.C. § 1673d(b)(4)(A)(ii)(II) (identifying "a rapid increase in inventories of the imports" as a factor the Commission is to consider). With inventory levels increasing by only **[          ]** units from the pre-petition baseline, this represents a mere **[    ]** percent of 2024 consumption, equal to just under **[      ]** days of U.S. market supply.

As with the import volume data, the statute instructs the Commission to look to increases in inventories of merchandise subject to Commerce's critical circumstances findings to assess whether such increases in inventories are likely to "seriously undermine" the remedial effect of the Orders. The Commission's analysis and explanation is devoid of any explanation as to how a "build up" of inventory equivalent to **[    ]** percent of U.S. consumption in 2024 could seriously undermine the remedial effect of the order. This is not a situation where importers raced to build mass stock piles of inventory subject to Commerce's critical circumstances determination that could then be unleashed on the market once the antidumping duty order was imposed in a manner that could undermine the remedial effect of the order. To the contrary, this increase in

21

inventory levels is minor and would have no lingering effect on the market that could seriously undermine the effect of the significant antidumping duties imposed.

We are not asking the Court to reweigh the evidence and reach its own decision. Rather, we are asking the Court to review the Commission's decision and assess how it was able to reach the conclusion that it did, and whether the Commission adequately linked the record facts to the conclusions drawn. In this regard, the statutory analysis sets a high bar – the imports at issue must "seriously undermine" the remedial effect of the orders. The Commission's analysis is entirely silent as to how such small volumes of imports and inventories, even if evidencing some increase over the period, could "seriously undermine" the remedial effects of the order.

The substantial evidence standard requires that agency decisions be accompanied by "a satisfactory explanation" for the action taken *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). Moreover, the logical path of the decision "must be reasonably discernable" to the reviewing court. *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citing *Motor Vehicle Mfrs. Assn v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)). Here, the Commission simply cited record facts and reached a conclusion without any explanation as to how the facts supported its conclusion. The substantial evidence standard requires that the Commission do more, and this Court should remand the Commission's decision for further explanation. Vexas Corporation submits that upon a proper reflection and analysis of the record data, the record confirms that the import volumes and increase in inventories do not support an affirmative determination that the imports and inventories are likely to seriously undermine the remedial effect of the antidumping duty order.

22

**2.    The Commission Did Not Tie Its Discussion of Underselling and Market Share to the Statutory Inquiry**

In reaching its affirmative critical circumstances decision, the Commission puts significant weight on what it views as the "pervasive underselling of subject imports." *See* Commission Views at 75.  Although the statute allows the Commission to consider any factors it views as relevant, the Commission has not explained how an examination of underselling is relevant to the question of whether post-petition imports would "seriously undermine" the remedial effect of the orders.   The Commission's analysis only touches on considerations relevant to the "seriously undermine" standard in one sentence in the middle of its discussion of underselling, stating that "price declines are consistent with pricing behavior that would enable a rapid increase in import volume and inventories in the post-petition period." *Id.* at 74.  Whether underselling and price declines may be somehow related to increased import volumes and inventory levels says nothing as to how underselling in the post-petition and pre-order period may be indicative of a likelihood that the remedial effects of the order would be seriously undermined.

Although the Commission offers no explanation as to how these data are relevant, a past history of underselling would only seem to be relevant if that pattern of underselling were likely to continue post-order, thereby supporting a theory that prior imports could undermine the effectiveness of the order via further and continued underselling.  The Commission did not draw any such conclusions, nor did it explain how a history of underselling was relevant to its analysis.  Regardless, as detailed in Section V.A.1, above, the actual increase in import volume and inventories of merchandise subject to Commerce's affirmative antidumping critical circumstances period was relatively minimal.  Such small import volumes, even if they were

23

undersold at a later date, would not have any serious impact on the overall remedial effect of the antidumping duty order.

Similar issues exist with respect to the Commission's consideration of market share.  In particular, the Commission supports its critical circumstances finding with a statement that "subject imports universally undersold the domestic like product and gained **[      ]** percentage points of market share" in 2024.  Commission Views at 74.  The Commission makes no attempt to link this loss in market share to the post-petition imports subject to Commerce's affirmative critical circumstances decision, nor does the Commission explain how a loss in market share is at all germane to whether post-petition imports are likely to seriously undermine the remedial effects of the order.  To the contrary, with the antidumping duty order imposing significant duties, one would logically expect the domestic industry to recover some market share.  Moreover, the small import volumes and modest increase in inventories of merchandise subject to Commerce's affirmative antidumping critical circumstances determination could not have a material impact on the post-order market share captured by the domestic industry.  As discussed above, the total inventory relevant to the Commission's critical circumstances analysis was only **[      ]** units at the end of November 2024, equivalent to **[    ]** percent of 2024 consumption, having increased by only **[      ]** units from the pre-petition baseline, a mere **[    ]** percent of 2024 consumption.  *See* Commission Views at 72; Staff Report at Table 4.7  Such a small overhang in additional inventory would have no meaningful effect on post-order market shares.

The Commission's discussion of market share is also flawed in that it relates to *all Chinese imports*.  *See* Staff Report, Table C.1.  Under 19 U.S.C. § 1673d(b)(4)(A)(i), the Commission's determination must be based on "the imports subject to" Commerce's affirmative critical circumstances finding.  To the extent the Commission relied on market share

24

considerations that accounted for Xiamen Dalle imports, without isolating and excluding or otherwise accounting for those imports, its analysis is inconsistent with the statutory requirement that its determination be tied to the imports subject to Commerce's finding. Accordingly, the Commission's reliance on market share considerations that included Xiamen Dalle imports renders the Commission's reliance on the market share data contrary to law. As such, this aspect of the Commission's critical circumstances analysis is contrary to law and should be remanded for additional consideration.

**B.  The Majority's Analysis Did Not Address The Remedial Effect of the Orders**

As is outlined above, the question the Commission is tasked with answering under 19 U.S.C. § 1673d(b)(4)(A) (antidumping duty) 19 U.S.C. § 1671d(b)(4)(A) (countervailing duty), is "whether the imports subject to" Commerce's final affirmative critical circumstances determinations "are likely to undermine seriously the remedial effect of the" antidumping and countervailing duty orders. This assessment necessarily requires some evaluation and assessment of the remedial effect of the respective antidumping and countervailing duty orders. However, the Commission's analysis entirely ignores this key part of the critical circumstances analysis.

That is, under the statute, the Commission is tasked with evaluating whether a surge in imports after the filing of the petition is so great that an otherwise effective remedy – significant tariffs imposed on imports – will be blunted and undermined by prior imports and inventories that are not subject to duties. Moreover, the Commission is to determine not only whether such imports may have some impact on the remedial effect of the order, but must determine whether any such impact is likely to "undermine" the effectiveness of the orders, and do so "seriously." In his dissenting views, Commissioner Johanson rightly carried out this analysis, focusing on "the high antidumping and countervailing duty rates," finding that they were "likely to

25

significantly curtail subject imports if not eliminate them entirely." Dissenting Views at 7. Chaiman Johanson also focused on other tariff measures, including Section 301 tariffs and tariffs imposed under the International Emergency Economic Powers Act that also likely had some positive remedial impact on the domestic industry. *Id.*

To be clear, it was obvious at the time of the Commission's analysis that the remedial effects of the antidumping and countervailing duty orders (whether measured from the date duties were first imposed or the date of the orders) in this case were likely to be significant. Commerce's preliminary countervailing duty rates ranged from 22.84 percent to 515.37 percent. *See Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Determination of Critical Circumstances, in Part, and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 96,942 (Dec. 6, 2024).

The preliminary antidumping duty rates ranged from *a minimum* of 127.35 percent to a high of 478.09 percent. *See Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Preliminary Affirmative Determination of Sale at Less-Than-Fair-Value Investigation, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination and Extension of Provisional Measures*, 90 Fed. Reg. 8,517 (Jan. 30, 2025) .

Commerce's final countervailing duty rates ranged from 31.45 percent to 679.44 percent. *See Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 90 Fed. Reg. 26,536 (June 23, 2025). Commerce's final antidumping duty rates ranged from 119.39 percent to 478.09 percent. *See Certain Low Speed Personal*

26

*Transportation Vehicles From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 26,530 (June 23, 2025).

As an importer of merchandise from companies subject to the "Separate Rate" antidumping rate and "All Others" countervailing duty rates, any imports by Vexas Corporation today would be subject to cash deposits of 292.00 percent (antidumping) and 41.14 percent (countervailing), *for a total duty rate of 333.14 percent*. *See Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Aug. 12, 2025) (amending certain of the rates set forth in the Final Determinations slightly).

Vexas Corporation is not suggesting that the Commission must take into account post-order or post-suspension import and inventory data; rather, the Commission needs to evaluate how the post-petition imports and inventories that it examined are expected to impact the remedial effect of the orders. These prohibitively high duty rates would necessarily have a significant impact on the market and imports, and would be expected to have a significant remedial effect in terms of curbing any unfairly traded imports and alleviating any injury suffered by the domestic industry by virtue of subject imports. As noted, Chairman Johanson considered these high duty rates to be a key piece of the analysis, but the majority makes no mention of the duties imposed or the expected remedial effect of the orders. By not even mentioning the duty rates imposed or expected remedial effect of the orders, we are left guessing how the majority viewed this issue. It is unclear if the majority views the duty rates and expected remedial effect to be wholly irrelevant as a legal matter, or if they had some unstated

27

view that post-petition imports would seriously undermining an otherwise impactful remedy.  Or, alternatively, they may have viewed the triple digit duty rates as not imposing a significant remedy, such that prior imports could seriously undermine it.  In short, we are left guessing as to the majority's views on the expected remedial effect of the orders, and so we are also left guessing as to how the majority came to the conclusion that prior imports were likely to seriously undermine that remedial effect.

In the absence of any discussion or analysis of the expected remedial effects of the orders, the Commission's decision is unlawful and unreasonable under the standard articulated in *Motor Vehicle Mfrs. Assn v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983), which held that agency decision may be unreasonable if the agency "entirely failed to consider an important aspect of the problem."  *Id*.  Even though the duty rates Commerce imposed are not listed as one of the factors that the Commission is expressly directed to consider, the "remedial effect" of the order, and the likely impact of subject imports on it, is *the* principal question the statute directs the Commission to answer.  The remedial effect of the orders therefore must be considered an "important aspect" of the analysis, and one which the Commission must address.  The Court of Appeals for the Federal Circuit has also indicated that there can be "important aspects of the problem that are not enumerated in the statute."  *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1356 (Fed. Cir. 2025).  For all of these reasons, the Commission's lack of any analysis of the remedial effect of the order renders the Commission's determinations with respect to both the antidumping and countervailing duty determinations unreasonable and unsupported.

## VI.    Conclusion

For the reasons set forth above, Vexas Corporation respectfully requests that this Court enter judgement on the agency record in its favor and remand the Commission's critical circumstances decision consistent with the arguments set forth herein.

Respectfully submitted,

/s/ Henry D. Almond
Henry D. Almond
J. David Park
Kang Woo Lee
Archana Rao P. Vasa

*Counsel to Vexas Corporation d/b/a Atlas*

ARNOLD & PORTER KAYE SCHOLER LLP
601 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20001
PHONE:  (202) 942-5646
FAX:  (202) 942-5999
E-MAIL: henry.almond@arnoldporter.com

**Dated:  March 18, 2026**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JANE A. RESTANI, SENIOR JUDGE**

_____

|  |  |
|---|---|
| TAO MOTOR INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| KANGDI ELECTRIC VEHICLE (HAINAN) | ) |
| CO., LTD. AND SC AUTOSPORTS, LLC | ) |
| dba KANDI AMERICA, and | ) |
| VEXAS CORPORATION, dba ATLAS, | )   **Consol. Court No. 25-00199** |
| | ) |
| Consolidated Plaintiffs, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| THE AMERICAN PERSONAL | ) |
| TRANSPORTATION VEHICLE | ) |
| MANUFACTURERS COALITION, | ) |
| | ) |
| Defendant-Intervenor. | ) |

_____)

**CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)**

The undersigned hereby certifies that the attached Memorandum in Support of Consolidated Plaintiff Vexas Corporation's Rule 56.2 Motion for Judgment Upon the Agency Record, filed on March 18, 2026, contains 8,107 words, exclusive of the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing system used to prepare this brief, and inclusive of the words in the embedded images, counted manually. The brief therefore complies with the maximum 14,000 word count limitation set forth in the Court's Chambers Procedures.

By:    /s/ Henry D. Almond
Henry D. Almond

**Dated:  March 18, 2026**